FILED
2012 Oct-04  PM 04:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | |
|---|---|
| ANGELA SANDERS, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )  CASE NO. 6:12-CV-0050-IPJ |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This matter is before the court on the record. This court has jurisdiction pursuant to 42 U.S.C. § 405. The plaintiff is seeking reversal or remand of a final decision of the Commissioner. All administrative remedies have been exhausted.

### Procedural Background

The plaintiff, Angela Sanders, brings this action pursuant to the provisions of Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405, seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for disability insurance benefits and supplemental security income. Plaintiff protectively filed for Supplemental Security Income benefits and Disability Insurance benefits on May 6, 2008, alleging an inability to work beginning April 14, 2008 (R. 176, 178) due to problems related to fibromyalgia (R. 229). The administrative law judge ("ALJ")

denied plaintiff's application on July 7, 2010 (R. 16–26). The Appeals Council denied her request for review on December 20, 2011 (R. 1–3). The ALJ's decision thus became the final order of the Commissioner. *See* 42 U.S.C. § 405(g).

### Factual Background

Plaintiff was 42 years old at the time of her hearing and has an associate's degree in applied sciences (R. 97). Her most recent job was as an "insurance verifications specialist at Southeast Cancer Network" (R. 101). At the time of her hearing, plaintiff had a 17-year old daughter who lived with her (R. 98). She smokes approximately one pack of cigarettes "every two or three days," and does not use alcohol (R. 100).

Plaintiff alleges she is unable to work because of severe pain in her lower back, neck, and left shoulder (R. 101-02). Plaintiff testified at her first hearing before the ALJ, on November 5, 2009 (R. 94),[1] that she has been treated for and told that she has a herniated disc in her back at the L3-4 level as well as MRI results showing a partial tear in her left shoulder (R. 102). Her doctor told her that when the tear became a complete tear, he would operate on it (R. 102). She also testified that she has pain in "all" of her joints and numbness in her hands and wrists (R. 103). She later noted that her right hand is "usually a little bit worse" than her left (R. 54). At her initial hearing, plaintiff was wearing a brace on her left arm, which she testified was

---

[1] The record indicates that plaintiff received a supplemental hearing on March 12, 2010, for the purposes of hearing testimony from a VE (R. 42).

prescribed by her doctor due to severe pain in that arm (R. 103). Plaintiff also claims to have numbness in both legs and both feet and pain that goes down her left leg all the way to the ankle (R. 103). In her Disability Report, plaintiff stated that her ability to work is limited by fibromyalgia, such that she "cant [sic] do any physical activities" (R. 229).

Plaintiff testified that her pain level is approximately an 8 on a 1–10 scale on an average day (R. 106). She takes Lortab and Morphine Sulfate to manage her pain (R. 106). Plaintiff asserts that she is "still in severe pain, even on the medication," approximating her pain level at "[p]robably a 6.5 or 7" on a "continuous" basis after taking the medication (R. 106). Plaintiff testified that she stopped working because she "just got to the point to where [she] couldn't handle the pain anymore" (R. 100). She said [i]t got to where [her] shoulders and . . . neck was [sic] just hurting so bad that [she] couldn't . . . do the typing, . . . sitting in the computer desk chair, and with my lower back problems, there was just too much pain from that" (R. 56). She testified that she is unable to sit for longer than 30 or 45 minutes without pain or to "use [her] arms and shoulders the way [she] used to, because of the severe pain" (R. 100-01). She claims she cannot stand for more than 15 minutes, but that she can walk around the house and in the grocery store (R. 101). In her past job, plaintiff had to sit and stand sometimes, and plaintiff claims she can no longer do so because she "was taking more medication than [she] was supposed to take and it still didn't help the

pain," which was "so much worse" than her present level of 8 when she was working (R. 106-07). Plaintiff testified that she doesn't believe there is any job she could currently perform because she is not aware of any job that would "allow [her] to lay down periodically through the day to ease the pain" (R. 108, 114). She also said that she has difficulty concentrating because of her pain; specifically, she has "had a lot of complaints from people that . . . they have to repeat things . . . several times because [she doesn't] understand" and she "can't concentrate" and "can't understand what people are telling [her] the way that [she] used to" (R. 112). Plaintiff has received several epidural blocks on her lower back (R. 119). Plaintiff testified that these treatments "help for a little while . . . at least for two or three weeks," such that the pain "doesn't go away completely, but it seems to ease up a little bit for two or three weeks. But it's supposed to help you for three or four months, and it never has" (R. 119).

Plaintiff testified that she has numerous restrictions in her daily activities. Plaintiff said that she drives to church and to the grocery store "[m]aybe once a week" (R. 98-99). She says that when she takes her daughter to school, she "can barely get out of the car to get back in the house because [her] joints are so stiff" (R. 105). She can do "light housework," including laundry, but "can never do a whole sink of dishes" and cannot vacuum, sweep, or mop (R. 99, 105). Plaintiff said it can sometimes take her three trips to the sink, with rest in between, before she can finish

one sink-full of dishes (R. 107-08). She also described an inability to dust on the lower shelf and requires help from her daughter to change the sheets on the bed (R. 110). Plaintiff said she can cook "light meals," but there is "no way [she] could cook a Thanksgiving meal or anything like that" (R. 110). She wears slip-on shoes because she said she would be unable to bend over and tie regular shoes (R. 110). She also testified to having difficulty dressing after bathing because she has difficulty lifting her legs to put clothes on (R. 110-11).

Plaintiff described numerous physical limitations due to her pain. Plaintiff testified she lays down on the bed for approximately three to four hours per day, and that when she lays down (during the day and when sleeping at night), she must flip back and forth from one side to another approximately every half hour (R. 105). She testified that she cannot lift her left arm "near as far as the right" because it "causes a lot more pain" (R. 108). She has difficulty sleeping, for which she takes Ambien, but she still cannot sleep through the night because she is "tossing and turning, trying to relieve the pain from laying," and she usually gets up "a couple" times a night (R. 109). Plaintiff subsequently testified that if she does not take Ambien, she "usually can't sleep at all because the pain is so bad" (R. 53-54).

Finally, plaintiff testified that she has depression and that she takes Cymbalta, which "seems to help" with her symptoms (R. 112-13). She also takes "something for blood pressure, cholesterol," "a muscle relaxer," and "Neurontin . . . for the arthritis"

(R. 56).

The record includes plaintiff's treatment history beginning in 2000. Plaintiff appears to have moved several times during this period; thus, it is difficult to summarize her records in linear chronological order because she was treated by various physicians for the same ailments at different times and for different intervals.

Some records not germane to plaintiff's present claim are provided. Records dating from August 7, 2000, until June 4, 2004, detailing plaintiff's history of treatment during that time for both depression and anxiety and neck, back, and shoulder pain; *see* R. at 284-356. Notes in the records also indicate that plaintiff had "pins [and] screws" placed in one of her ankles in 1993, had her gall bladder removed in 2001, and underwent a hysterectomy in 2002 (R. 412). Emergency room records from a visit on July 14, 2007, show that plaintiff was found to have a small plantar spur on the right calcaneus (R. 442, 45). Records from a June 26, 2008, visit to Dr. J. Todd Smith reveal that plaintiff had fractured her left 5th metatarsal; plaintiff was told to wear a boot and follow up in six weeks (R. 448).

Records relevant to plaintiff's application for benefits begin on September 24, 2002, where an x-ray showed cervical degenerative changes at C2-3 "almost like a natural fusion or ankylosis at that level" (R. 392). Treatment notes from December 12, 2003, by Dr. Edwin Kelsey at Birmingham Pain Management ("BPM") show a diagnosis of chronic lower back pain secondary to degenerative joint disease ("DJD")

of the cervical and lumbar spine, with the former being "advanced"; plaintiff received one of many epidural blocks on that day (R. 389). On October 5, 2004, plaintiff was diagnosed with fibromyalgia, and Dr. Kelsey noted that plaintiff's DJD was "advanced" in both the cervical and lumbar spine; plaintiff received another epidural block (R. 384). Dr. Kelsey noted that plaintiff was taking the following medications as of October 5, 2004: Lortab,[2] 10 mg/6 hours as needed; Soma,[3] 350 mg/6 hours as needed; and Klonopin,[4] 0.5 mg/daily as needed at bedtime (R. 384).

Records from October 2004 through March 2008 show that plaintiff continued to report pain and continued to request treatment from BPM with epidural blocks (R. 358-84). The records indicate that plaintiff received such blocks on February 3, 2005 (R. 382-83); April 1, 2005 (R. 380-81); September 27, 2005 (R. 377-78); January 24, 2006 (R. 375-76);[5] January 19, 2007 (R. 372-73);[6] May 17, 2007 (R. 369-70);

---

[2] Lortab is a brand name of Acetaminophen mixed with Hydrocodone Bitartrate, a generic drug used to treat pain. *See* PHYSICIANS' DESK REFERENCE 117 (PDR Network, LLC, 2012).

[3] Soma is a brand name of Carisoprodol, a generic drug used to treat muscle spasms and pain. *See* PHYSICIANS' DESK REFERENCE 118 (PDR Network, LLC, 2012).

[4] Klonopin is a brand name of Clonazepam, a generic drug used to treat panic disorder and seizures. *See* Physicians' Desk Reference 119 (PDR Network, LLC, 2012).

[5] On this date, plaintiff was also prescribed Celebrex, 200 mg/twice daily. Celebrex is a brand name of Celecoxib, a generic drug used to relieve pain caused by osteoarthritis. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001050/ (last visited September 26, 2012).

[6] Records indicate that by this date plaintiff had begun taking Relafen, 500 mg/twice daily. Relafen is a brand name of Nabumetone, a generic drug used to treat osteoarthritis. *See* PHYSICIANS' DESK REFERENCE 124 (PDR Network, LLC, 2012).

September 14, 2007 (R. 366-67);[7] December 12, 2007 (R. 362-64);[8] and March 7,

2008 (R. 359-60).

Records from Dr. J. Todd Smith dated August 18, 2005, indicate that plaintiff

visited Dr. Smith's clinic in Winfield, Alabama, complaining of low back pain, left

arm pain, and shoulder pain (R. 450). X-rays of the left shoulder AP, axillary, and

outlet revealed mild lumbar spondylosis with left shoulder impingement, mild AC

joint arthrosis with left arm radiculopathy, and left leg radiculopathy  (R. 450). Dr.

Smith sent plaintiff for an MRI and saw her back a week later, on August 25, 2005;

the MRI revealed lumbar spondylosis and cervical spondylosis with left shoulder

impingement (R. 449).

A report by Dr. John Waldo summarizing the findings of an MRI taken

December 21, 2007, indicates plaintiff had early degenerative changes at L4-5, and

facet degenerative changes at L4-5 and L5-S1, but that no focal spinal stenosis,

herniation, or significant foraminal narrowing was detected (R. 438).

A consultative psychological examination was conducted by Bonnie Atkinson,

Ph.D., on July 28, 2008 (R. 452). The exam showed that plaintiff's orientation was

---

[7] Records indicate that by this date plaintiff had begun taking Lyrica, 150 mg/twice daily. Lyrica is a brand name of Pregabalin, a generic drug used in the treatment of pain related to fibromyalgia. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000327/ (last visited September 26, 2012).

[8] Records indicate that by this date plaintiff had begun taking Kadian, 30 mg/daily. Kadian is a form of oral morphine used to treat severe pain. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000590/ (last visited September 26, 2012).

appropriate; general information, thought and concentration were normal; language comprehension was good; speech was clear; memory function was claimed to be normal; and plaintiff was "likely to be functioning in the average range" (R. 455-56). Though a diagnosis of an adjustment disorder with depressed mood was noted, Dr. Atkinson concluded that plaintiff "does have sufficient judgment to make acceptable work decisions [and] to direct or manage her own funds" (R. 456-57; *see also* R. at 482). Plaintiff's Global Assessment of Functioning ("GAF") score was reported at 75–80 (R. 457)—which, as the ALJ notes, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: DSM-IV states is "consistent with the finding that if symptoms are present, they are transient and expectable reactions to psychosocial stressor and result in no more than a slight impairment in social, occupational, or school functioning" (R. 23).

A consultative physical examination was conducted by Dr. Clarke Woodfin, Jr., on July 28, 2008 (R. 459-62). On that date, plaintiff's medications were listed as Cymbalta,[9] 60 mg/daily; Atenolol,[10] 25/50 mg/daily; Lyrica, 200 mg/twice daily; Kadlen, 30 mg/twice daily; Lortab, 10 mg/four times daily; Soma, 350 mg/four times

---

[9] Cymbalta is brand name of Duloxetine, a generic drug used to treat depression and general anxiety disorder. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000274/ (last visited September 26, 2012).

[10] Atenolol is a generic drug used to treat hypertension. *See* PHYSICIANS' DESK REFERENCE 118 (PDR Network, LLC, 2012).

daily; Prilosec,[11] 40 mg/daily; and Tricor,[12] 145 mg/daily (R. 459). The ALJ

adequately and objectively summarized the findings of Dr. Woodfin's examination;

*see* R. at 22. Notably, Dr. Woodfin's summary was as follows:

> [Plaintiff's s]peech and hearing, travel and dexterity are unaffected. She should be able to occasionally lift and carry 10 to 15 [pounds], sit frequently, be on her feet for 1/3 of a day, and walk for 1/3 of a day. Effort was good on all testing. Regarding motivation, there should be many tasks which she could do, as can be seen from [the results of the examination]. There were no tears during this examination and no "poor me" so often seen with fibromyalgia.

R. at 462.

Dr. Samuel Williams completed plaintiff's Psychiatric Review Technique (R.

479-92) on August 20, 2008, and found as follows: plaintiff has adjustment disorder

with depressed mood (R. 482); plaintiff has anxiety disorder (R. 484); plaintiff has

moderate limitations in restriction of activities of daily living, difficulties in

maintaining social functioning, and difficulties in maintaining concentration,

persistence, or pace (R. 489); and plaintiff has experienced no episodes of

decompensation of extended duration (R. 489). On plaintiff's Mental Residual

Functional Capacity Assessment (R. 493-96), also completed on August 20, 2008, Dr.

Williams noted that plaintiff is "Moderately Limited" with respect to the following

---

[11] Prilosec is a brand name of Omeprazole Magnesium, a generic drug used to treat heartburn. *See* PHYSICIANS' DESK REFERENCE 125 (PDR Network, LLC, 2012).

[12] Tricor is a brand name of Fenofibrate, a generic drug used to treat high cholesterol. *See* PHYSICIANS' DESK REFERENCE 121 (PDR Network, LLC, 2012).

areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting (R. 493-94). He noted that plaintiff is "[c]apable of concentrating for 2 hours at a time" and that "[c]ontact with co-workers, supervisors and [the] general public should be casual and non-confrontational and changes in the workplace introduced slowly due to Adjustment Disorder and history of Anxiety" (R. 495).

On December 3, 2008, plaintiff underwent a series of MRIs by referral from Dr. Todd Smith, and the results were read by Dr. Thomas Harrell (R. 497-99). The MRI of the cervical spine revealed partial fusion at the C2-3 level, with mild posterior foraminal narrowing on the left due to facet joint spurring at the C4-5 level (R. 497). The MRI of the lumbar spine revealed no significant findings (R. 498). The MRI of the left shoulder revealed an incomplete tear of the supraspinatus tendon, mild subacromial bursitis, mild degenerative changes at the AC joint with small effusion,

and small glenohumeral joint effusion (R. 499). An addendum to the MRI of the lumbar spine dated December 5, 2008, and signed by Dr. Noel Berquist, notes the following: "a sacralized L5 or lumbarized S1. The last intervertebral disc space will be at the S1, S2 intervertebral space now with a lumbarized S1"; "[a]t the L3-4 level, there is the central left paracentral broad-based disc herniation with slight inferior migration centrally"; "[a]t L4-5, there is a small right-sided facet joint effusion with diffuse disc bulge, predominating in the left paracentral region"; "[a]t L5-S1, there are no abnormalities appreciated"; "[a]t the S1-2 level, there is disc space with no desiccation changes" (R. 506). After receiving these MRIs, plaintiff followed up with Dr. Smith on December 4, 2008; his impression was that plaintiff has "some mild spondylosis at 2-3, 3-4, and 4-5 with left shoulder impingement, incomplete rotator cuff tear with lumbar spondylosis" (R. 503).

Plaintiff underwent a Psychological Evaluation by Alan Blotcky, Ph.D. on February 5, 2009 (R. 500-02). He found her thinking to be logical and orderly, her speech normal, her abstract thinking adequate and her memory functioning adequate; however, he opined that plaintiff "seemed depressed" and that [h]er affect was restricted" and "energy level . . . deficient" (R. 501). Dr. Blotcky found that plaintiff's full-scale IQ is 82, placing her "at the lower end of the Low Average range of intellectual abilities" (R. 501). He also found she achieved a score of 39 on the Beck Depression Inventory, indicating the presence of severe depression (R. 501). His

impression was that plaintiff suffers from severe dysthymic disorder, has low average intellectual abilities, needs to be under the care of a mental health professional who can provide treatment in the form of a combination of medication and individual counseling, and that her prognosis is "poor because of her dysthymic disorder that is severe" (R. 502). He placed her GAF score at 50 (R. 502), which, as the ALJ notes, is "indicative of serious symptoms" (R. 23).

Treatment records from February through November 2009 show that plaintiff was treated for a variety of ailments including a persistent cough and knee pain (R. 516-26). A physician is not identified in all of the records; however, plaintiff did undergo an MRI of the left knee on November 3, 2009, read by Dr. John Waldo (R. 525-26). He found "a small amount of signal in the posterior horn of the medial meniscus that may represent degeneration, but also could represent small meniscal tear" (R. 525). Additional records indicate that plaintiff received epidurals with fluroscopy for needle localization on June 19, 2009 (R. 527-29), December 28, 2009 (R. 531-32), and March 15, 2010 (R. 535-36).

On August 28, 2009, a Vocational Evaluation Report ("VER") was issued by the Alabama Department of Rehabilitation Services summarizing the results of an Evaluation Report of plaintiff conducted on July 7, 2009, by Adrienne Thompson, a Vocational Adjustment Counselor at the Easter Seals Rehabilitation Center (R. 247-66, 268-70). The Evaluation Report concluded that plaintiff "would have difficulty

in an employment setting" (R. 249) and "has many issues in regard to her physical health that require attention so that she can cope with daily life" (R. 249-50). The VER stated that plaintiff has the chronic conditions of Degenerative Disc Disease, Fibromyalgia, and Dysthymic Disorder, which require frequent trips to the doctor and multiple medications which "due to the strong side effects, affect her ability to function" (R. 247).The VER also stated plaintiff "is unable to work" due to these conditions and their symptoms, and listed numerous "impediments to employment" from which plaintiff suffers: difficulty initiating and/or completing tasks; limited ability to lift/bend/carry/sit/stand; limited endurance; limited mobility; limited upper extremity dexterity and/or function; performance speed and/or accuracy is impaired/difficulty prioritizing tasks; difficulty sustaining attention; difficulty with expressive/receptive communication; and limitation in establishing work relationships (R. 247).[13]

An MRI of plaintiff's left shoulder was taken on February 11, 2010 (R. 534). Dr. Scott Loveless read the MRI and found a "mild AC joint OA with normal rotator cuff" (R. 534). Records from a March 12, 2010, physician visit indicate that plaintiff had no mobility limitations (R. 543). A CT scan of bone densitometry taken on July 26, 2010, and read by Dr. Waldo revealed osteoporosis in the lumbar spine (R. 672).

---

[13] When plaintiff's attorney asked the VE "what bearing, or what effect would [a VER-] type of report have on [plaintiff's] ability to perform work in the workplace," the VE responded that the report "would preclude the ability to sustain any form of work, be it unskilled or semi-skilled or skilled" (R. 127-28).

On July 28, 2010, an MRI of plaintiff's left knee revealed that signal changes in the posterior horn of the medial meniscus are slightly more irregular and appear to abut articular surfaces when compared to previous study (R. 670). Dr. Randall Finley, the physician reading the MRI, also opined that a tear in the posterior horn of the medial meniscus is suspected (R. 670-71). On November 24, 2010, an MRI of plaintiff's left shoulder revealed subcoracoid, subacromial, and most prominently subdeltoid bursitis fluid collections with no evidence of a rotator cuff tear (R. 665).

On March 12, 2010, Dr. Kelsey, plaintiff's treating physician, wrote to the Social Security Administration that he had been plaintiff's physician since October 18, 2002, that at present she is currently unable to sustain an 8-hour work day, and that her condition is expected to last 12 months or longer (R. 548).[14]

At plaintiff's initial hearing, the Vocational Expert ("VE") testified that plaintiff's prior work experience is at the "sedentary exertional level with an SVP of 5" (R. 121). The ALJ posited to the VE a hypothetical individual with the following characteristics and asked if such individual could return to plaintiff's prior work: capable of performing light work who can sit for eight hours; able to sit six hours out of an eight-hour workday with normal breaks; no work on ladders, ropes, or scaffolds;

---

[14] Plaintiff has been on and off numerous medications over the past decade. It is difficult to determine from the record precisely what medication plaintiff took when, though the first instance available of plaintiff taking specific medications has been noted *supra* where available. Plaintiff self-reported a list of her medications to the Social Security Administration; *see* R. at 271. The record does not contain evidence indicating when plaintiff began taking these medications in all instances.

occasionally climbing of ramps and stairs; no work on unprotected heights; and no overhead reaching (R. 122). The VE testified that such individual would be able to perform "all sedentary level work activity that [plaintiff] had" (R. 122). The VE's response was the same when the hypothetical individual was limited to a "sedentary type job" (R. 123). The ALJ's third hypothetical involved an individual with all the limitations expressed in hypotheticals one and two, with several additional limitations: a "sit-and-stand type job," where such individual could stand for 15 minutes and then sit for 30 minutes throughout an eight-hour workday; a "low-stress job" defined as "an SVP of 2 or less, involving only simple work-related decisions"; ability to concentrate for two-hour periods across an eight-hour workday with normal breaks; and gradual introduction of any changes in work environment (R. 123). The VE replied that such limitations would "preclude all past work" performed by plaintiff, but that "[t]here would be other examples of unskilled work that the individual could perform," including the "light and unskilled" jobs of parts assembler, sub-assembler of electronic components, and nut and bolt assembler and the "sedentary unskilled" jobs of final assembler and rotor assembler (R. 124-25).

Plaintiff received a supplemental hearing on March 12, 2010, for the purposes of hearing testimony from a VE and a Medical Expert ("ME") (R. 42).[15] The ME, who

---

[15] The record indicates that the first VE, Thomas Elliot, was unable to attend the second hearing due to illness, and a different VE, Julia Russell, appeared in his stead. *See* R. at 42, 94. The ME, Dr. Allan Levine, appeared by phone. *See* R. at 42. For the benefit of the new VE, plaintiff was again examined at length regarding her physical ailments and complaints of pain (*see* R. at 45-60); except where noted, plaintiff's answers did not differ in substance from those

did not examine plaintiff personally and only reviewed plaintiff's records (*see* R. at 68), detailed plaintiff's medical history as evidenced by the record (*see* R. at 64-67) and determined that plaintiff did not meet a listing with regard to the back and neck "as there is no evidence of any nerve root or spinal cord compromise" (R. 65). With regard to plaintiff's shoulder pain, the ME found that her left shoulder "was noted to have some slight impingment, but there's no evidence of, quote, 'extreme loss of function in both upper extremities,' which would be necessary to meet a listing level relative to the upper extremities" (R. 66). The ME also noted, with regard to plaintiff's knee, that no listing is met because there is no evidence of "significant loss of, or an inability to effectively ambulate" (R. 67). The ME then concluded that plaintiff's residual functional capacity ("RFC") is as follows:

> [Plaintiff] should be able to lift occasionally 15 pounds, frequently 10, but not above shoulder level or horizontal level. She should be able to sit six out of eight hours with customary breaks. She should be able to stand for [sic] out of eight hours but less than 45 minutes at one time without the ability of sitting even if it's for a couple minutes to change the position. And similar with walking: four out of eight hours, but I don't think she should be walking longer than 30 minutes at one time. She should be able to occasionally manipulate stairs, crouch, or stoop, but not repetitively. She should avoid ladders, kneeling, crawling, heavy vibratory machinery, unprotected heights, and extreme cold exposure. And again . . . she should have unlimited use of the upper extremity for fine and gross manipulation as long as there was no requirement to go above the horizontal or shoulder position, or level, rather.

provided during her first hearing.

R. at 67-68. When asked by the ALJ if plaintiff's pain was considered in the statement of plaintiff's RFC, the ME replied in the affirmative (R. 68).

The ALJ then heard the testimony of the second VE, Julia Russell (R. 75). The VE testified that none of plaintiff's prior job skills are transferable, save for "clerical skills that can be performed across settings . . . but [which] don't transfer to other types of work" (R. 78). The ALJ then posed a hypothetical individual who is the age, education, prior work history, and training of plaintiff who has the limitations expressed by the ME, *supra*, and the VE stated that such individual could return to the past work at the "sedentary" exertional level but could not return to two jobs at the "light" exertional level (R. 78-79). Assuming a second hypothetical individual identical to the first but with additional non-exertional limitations and the need for a "low-stress job" defined as "SVP 2 or less . . . involving only simple work-related decisions," the VE replied that such individual could not return to any of plaintiff's prior work, but that there would be unskilled work at the sedentary exertional level that could be performed such as assembler, tester, sorter, sampler, and clerical worker (R. 80-81).

## Standard of Review

In a Social Security case, the initial burden of establishing disability is on the claimant, who must prove that due to a mental or physical impairment he is unable to perform his previous work. *See Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987). If the claimant is successful, the burden shifts to the Commissioner to prove that the claimant can perform some other type of work existing in the national economy. *See id.*

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983).  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also  Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Bloodsworth*, 703 F.2d at 1239.

This court also must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *See McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993). No presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *See Brown v. Sullivan*, 92 F.2d 1233, 1235 (11th Cir. 1991); *Corneliius v. Sullivan*, 936 F.2d 1143,

1145 (11th Cir. 1991). Furthermore, the Commissioner's "failure to . . . provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145–46. When making a disability determination, the Commissioner must, absent good cause to the contrary, accord substantial or considerable weight to the treating physician's opinion as against the opinions of other physicians. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Walker*, 826 F.2d at 1000.

## Legal Analysis

In this case, the ALJ found that plaintiff has the severe impairments of "degenerative disc disease of the cervical and lumbar spine with spondylosis and a herniated disc at L3–4 with chronic pain and an affective mood disorder" (R. 18). He then denied the plaintiff benefits, finding that her impairments do not "meet[] or medically equal[]" the so-called "Paragraph B" criteria, listed in 20 CFR Part 404, Subpart P, Appendix 1, and that "[t]here is no evidence to show the claimant's impairments have resulted in limitations consistent with any listing" (R. 18-19). The ALJ found that plaintiff has the residual functional capacity ("RFC") to perform unskilled sedentary work with the following limitations: sitting for six hours in an eight hour day with customary breaks; standing for four hours in an eight hour day for less than 45 minutes; walking for four hours in an eight hour day for no longer than 30 minutes at a time; lifting 15 pounds occasionally and ten pounds frequently,

provided such lifting occurs horizontally and not above shoulder level; occasional manipulation of stairs, crouching, and stooping, but avoidance of climbing ladders, kneeling, crawling, and work around dangerous moving machinery, work at unprotected heights, and work in areas of extreme cold; unlimited use of the upper extremities as long as she is not required to go above the horizontal shoulder position; and low stress work with an SVP2 or less, involving only simple work-related decisions (R. 19). He further concluded that despite plaintiff's allegations of an inability to work due to her impairments, "she has continued to report an ability to perform a wide range of activities," including the ability to cook, do laundry, change sheets, care for her cats, watch television, shop for groceries, and attend church, and that such "level of activit[y] . . . is inconsistent with disabling limitations" (R. 21). He stressed that "[f]urthermore, medical evidence has not supported limitations which have significantly impacted her level of functioning" (R. 21).

The ALJ's findings are not supported by substantial evidence. Notably, minimal daily activities do not render one capable of performing work. *See Venette v. Apfel*, 14 F. Supp. 2d 1307, 1314 (S.D. Fla. 1998) (citing *Walker v. Heckler*, 826 F.2d 996 (11th Cir. 1987)). Yet even disregarding this maxim, the Eleventh Circuit Court of Appeals has stated that the opinion of a treating physician is to be given substantial weight in determining disability. *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986); *Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986);

*Spencer on behalf of Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985). Absent good cause to the contrary, the Commissioner must accord substantial or considerable weight to the treating physician's opinion. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The ALJ blatantly disregarded this standard in this case.

Plaintiff's treating physician, Dr. Kelsey, opined in 2010 that plaintiff is unable to sustain an eight-hour workday; *see* R. at 548. Dr. Kelsey has treated plaintiff consistently since 2002 and is the only long-term treating physician on record.[16] Dr. Kelsey's opinion is supported by copious documentation, as he has attended to plaintiff consistently, albeit not exclusively, for her ailments for nearly a decade. But rather than according "substantial or considerable" weight to Dr. Kelsey's opinion, as mandated by the Eleventh Circuit, the ALJ has instead discounted that opinion and supplanted Dr. Kelsey's medical judgment with his own. First, he expressly stated that he has accorded Dr. Kelsey's opinion "little weight" because though plaintiff's "records showed a significant history of treatment . . . she did not report a level of pain or limitations which were disabling" (R. 23-24). In other words, because plaintiff

---

[16] Plaintiff has seen other physicians for extended duration since 2002, such as Dr. John Waldo (*see* R. at 438, 525-26, 672), but only Dr. Kelsey has seen plaintiff consistently since she first complained of her present ailments in 2002.

did not whine enough, her doctor's medical judgment rings hollow. Then, the ALJ opined that "with [plaintiff's] history of back pain and considering her reported pain associated with fibromyalgia, she would have limitations more consistent with a sedentary level of exertional activity . . . consistent with the treatment she has received and supported by the opinion of Dr. Woodfin which is also given considerable weight" (R. 23). Dr. Clarke Woodfin is not plaintiff's treating physician; he has seen plaintiff only once, for her consultative physical examination on July 28, 2008. *See* R. at 459-62.

The ALJ's conclusory rejection of Dr. Kelsey's assessment directly contravene his duty under the law. While it is true that the Social Security Administration reserves to itself the issue of "disability" (*see* Social Security Ruling 96-5p), under the Social Security Administration's own guidelines,

> Generally, we give more weight to opinions from . . . treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . .

 20 CFR 416.927(c)(2) (2012). Further, the longer a treating source has treated a claimant and the more knowledge that source has of the impairments at issue, the more weight is due that source's opinion. *See* 20 CFR 404.1527(c)(2)(i)–(ii) (2012). Thus, an ALJ may not simply dismiss a treating opinion at his whim. Here, however, the ALJ

not only discounted the treating physician's opinion because—in his subjective view—plaintiff's complaints about her level of pain were insufficient, but also supplanted it with his own subjective diagnosis, based on his belief of what plaintiff's history should dictate about her condition, as supported by the "considerable weight" of the opinion of a physician who saw plaintiff only once.[17]

By inferring that plaintiff was able to work from his selective review of the evidence, the ALJ substituted his opinion for that of plaintiff's treating physician. While the ALJ is permitted to reject the opinion of any physician when the evidence supports a contrary conclusion (*see Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)), "[a]s the hearing officer, [the ALJ] may not arbitrarily substitute his own hunch or intuition for that of a medical professional" *See Marbury v. Sullivan*, 957 F.2d 837, 840–41 (11th Cir. 1992). Moreover, the ALJ is required to state with particularity the weight he gives to different medical opinions and the reasons why. *See Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

> Absent "good cause," an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight." *Lewis*, 125 F.2d at 1440; *see also* 20 C.F.R. §§ 404.1527(d)(1)-(2). Good cause exists

---

[17] The ALJ opines that plaintiff has continued "to perform a wide range of daily activities which are inconsistent with disabling limitation" (R. 23) and "to show an ability to perform a wide range of daily activities which are inconsistent with that level of limitation" (R. 24), yet can point to no such activities plaintiff performs save minimal household chores, grocery shopping, and occasional attendance at church (*see* R. at 20). The ALJ appears to disregard plaintiff's own testimony with respect to the immense difficulty she experiences in performing these necessary tasks of daily living; *see* R. at 98–111. Regardless, the court reiterates that minimal daily activities do not render one capable of performing work, even at the sedentary level. *See Walker v. Heckler*, 826 F.2d 996, 1001 (11th Cir. 1987).

"when the: (1) treating physician's opinion was not bolstered by evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.2d at 1241. With good cause, an ALJ may disregard a treating physician's opinion, but he "must clearly articulate [the] reasons" for doing so. *Id.* at 1240-41.

*Winschel v. Comm'r of Soc. Security*, 631 F.3d 1176, 1179 (11th Cir. 2011). In short, "good cause" exists if the opinion is wholly conclusory, unsupported by the objective medical evidence in the record, inconsistent within itself, or appears to be based primarily on the patient's subjective complaints. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *see also Crawford v. Comm'r of Soc. Security*, 363 F.3d 1155, 1159-60 (11th Cir. 2004); *Lewis*, 125 F.3d at 1440.

The ALJ can show no such "good cause" here. No medical evidence contradicts Dr. Kelsey's opinion, which is consistent and based on his decade-long history as plaintiff's primary treating physician and supported by copious medical records chronicling the nature and extent of plaintiff's pain. In light of these considerations, the court finds the record devoid of substantial evidence to support the decision of the ALJ.

The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Before the court in this case are multiple medical opinions concerning the nature, origins, and severity of plaintiff's disability. By

inferring that plaintiff was able to work from his selective review of the evidence, the ALJ substituted his opinion for that of all of the medical reports in the file, which taken together establish that plaintiff is indeed disabled.

### Conclusion

Based on the foregoing, the court is of the opinion that the decision by the ALJ was not supported by substantial evidence, and therefore the decision of the Commissioner must be **REVERSED** and this case **REMANDED** for the calculation of benefits to which plaintiff is entitled. The court shall so rule by separate order.

**DONE** and **ORDERED** this the 4th day of October 2012.



INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE